UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JASON L. TIBBS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 1:20-cv-01564-JMS-MJD |
| | ) |
| DUSHAN ZATECKY, | ) |
| | ) |
| Respondent. | ) |

**Order Denying Petition for Writ of Habeas Corpus
and Granting Certificate of Appealability**

Jason Tibbs was convicted in 2014 for the 1993 murder of Rayna Rison. Following exhaustion of available state court remedies, including state post-conviction proceedings, he brought this 28 U.S.C. § 2254 petition for a writ of habeas corpus. Mr. Tibbs alleges that his trial counsel was ineffective for failing to introduce evidence of a 1998 fiber examination that might have pointed to a different suspect and for failing to properly use the transcript of a police interview to impeach the State's primary witness. Because Mr. Tibbs has not shown a reasonable probability of a different trial result absent these alleged errors, his habeas corpus petition is denied.

## I.  Background

### A.  Rayna Rison's Disappearance and the Ensuing Search

Ms. Rison and Mr. Tibbs were both in their late teens when Ms. Rison was murdered. Trial Tr. 68. Ms. Rison worked after school as the "kennel girl" at an animal hospital in La Porte, Indiana. Trial Tr. 316. On a Friday evening in March 1993, her co-worker clocked out early, around 5:45 p.m., leaving Ms. Rison to close shop at 6:00 p.m. by herself. *Id*. Ms. Rison had planned to meet her boyfriend that evening at her parents' house for a date, but Ms. Rison never showed. Trial Tr. 559−60. Her parents and boyfriend searched and called all over town with no

success. Trial Tr. 562−64. Around 7:30 p.m., a stranger saw Ms. Rison's car parked on the side of the road several miles outside of town, but they didn't know whose it was. Trial Tr. 497−500. The car remained there until police recovered it the next day. Trial Tr. 503−04. Inside the car, police found a ring that belonged to Mr. Tibbs. Trial Tr. 666.

About ten days after Ms. Rison disappeared, someone found her boyfriend's letterman jacket in a tree near the side of a road. Trial Tr. 271. Police arrived to recover the jacket, and then Mr. Tibbs and a friend arrived at the same location roughly 10 minutes later. Trial Tr. 271−72.

Nearly a month after Ms. Rison disappeared, her body was found face down in a pond, a few feet offshore. Trial Tr. 224 Two tree limbs had been placed on her body. Trial Tr. 249.

### B.   Eric Freeman Testimony

Mr. Tibbs's friend Eric Freeman testified at trial as an eyewitness to Ms. Rison's murder. According to Mr. Freeman, Mr. Tibbs referred to Ms. Rison as his girlfriend, even though they hadn't dated since middle school. Trial Tr. 79. In the late afternoon on the day of the murder, Mr. Tibbs asked Mr. Freeman to drive him to the animal hospital. Trial Tr. 80−81. Mr. Freeman borrowed a silver Buick sedan from his girlfriend, Jennifer Hammons. During the drive, Mr. Tibbs explained that he wanted to "work things out" with Ms. Rison. Trial Tr. 81.

When they arrived at the animal hospital, Mr. Tibbs went inside and returned with Ms. Rison. Trial Tr. 82. They talked and argued outside for a short while, but they eventually both got into the back seat of the Buick. Trial Tr. 82−83. Mr. Freeman then drove toward Fail Road. During the drive, Mr. Tibbs and Ms. Rison continued arguing, as she explained that she did not want to be with him. Trial Tr. 84.

Mr. Freeman pulled over and parked in a patch of gravel next to the road. *Id.* Mr. Tibbs and Ms. Rison got out of the car and continued to argue. *Id.* Mr. Freeman exited the car and said,

"Come on, let's go." Trial Tr. 85. They instead continued to argue, and then Mr. Tibbs attacked Ms. Rison. *Id.* Mr. Freeman watched as Mr. Tibbs hit and choked Ms. Rison with his hands. *Id.* Then Mr. Tibbs told Mr. Freeman to pop the trunk, which he did. Trial Tr. 85−86. Mr. Tibbs placed Ms. Rison in the trunk, and they drove to the Hammons residence. Trial Tr. 86.

 Mr. Freeman backed the Buick into a pole barn on the property and opened the trunk. *Id.* He and Mr. Tibbs argued for some time about what had happened and what to do next. Trial Tr. 87. At some point, Mr. Freeman asked Mr. Tibbs why he had done it, and Mr. Tibbs responded, "If I can't have her nobody can." *Id.*

 The two men returned to the animal hospital to get Ms. Rison's car because Mr. Tibbs didn't want Ms. Rison's boyfriend to worry about where she was. Trial Tr. 87−88. Mr. Tibbs drove Ms. Rison's car to a pond by Range Road, and Mr. Freeman followed in the Buick. *Id.* There, they carried Ms. Rison's body and threw her in the pond, where she landed face down. Trial Tr. 89−90. Mr. Tibbs got in the water and placed some logs on Ms. Rison's body to weigh it down. Trial Tr. 91.

 Mr. Freeman then drove the Buick back to the Hammons residence, while Mr. Tibbs drove away in Ms. Rison's car. Trial Tr. 91. When Mr. Freeman saw Mr. Tibbs later that night, Mr. Tibbs was driving his father's pickup truck. Trial Tr. 92. Mr. Freeman scolded him and gave him a letterman's jacket that Ms. Rison had left in the back seat of the Buick. *Id.*

 In the following years, Mr. Freeman did not tell anyone what he knew about the murder. Trial Tr. 93−94. When Mr. Tibbs asked whether anyone had brought it up, Mr. Freeman truthfully told him they hadn't. Trial Tr. 94.

On cross-examination, Mr. Freeman acknowledged numerous prior inconsistent statements and acknowledged that interviewing officers were the first to introduce certain details about the events surrounding Ms. Rison's death:

- In a 2008 interview with police, Mr. Freeman denied even seeing Ms. Rison on the day she disappeared. Trial Tr. 109.

- In the 2008 interview, officers were the first to mention that Mr. Freeman and Mr. Tibbs were in the pole barn on the day of Ms. Rison's death. Trial Tr. 110.

- In the 2008 interview, officers were the first to mention Mr. Tibbs's romantic interest in Ms. Rison. Trial Tr. 112.

- In a June 2013 interview, Mr. Freeman initially stated that he left Ms. Rison's body in some hay in the pole barn; in another statement, he reported leaving the body in the barn overnight; at trial, he denied ever removing the body from the trunk in the barn. Trial Tr. 121.

- In a July 2013 interview, Mr. Freeman reported, inconsistent with his trial testimony, that Mr. Tibbs and Ms. Rison did not argue outside the animal hospital. Trial Tr. 115−16.

- In the July 2013 interview, Mr. Freeman reported that Mr. Tibbs told him to stop the car on Fail Road; in a deposition, he testified that it was Ms. Rison; at trial, he testified that they both told him to stop. Trial Tr. 117.

- In the July 2013 interview, Mr. Freeman said he was inside the car and looking in the rear-view mirror when he saw Mr. Tibbs choking Ms. Rison; at trial, he testified he was outside the car when he witnessed the choking. Trial Tr. 118.

- In the July 2013 interview, Mr. Freeman stated that Ms. Rison's body was covered by a blue tarp in the trunk; he didn't mention the tarp in his trial testimony, and the only other witness who claimed to see the body in the pole barn testified that there was no blue tarp. Trial Tr. 120, 152.

In addition to highlighting these inconsistencies, defense counsel raised the possibility of bias, eliciting testimony from Mr. Freeman's ex-girlfriend that she had accused him of having sex with Ms. Rison at some point during their relationship. Trial Tr. 208, 218.

Defense counsel later tried to introduce the transcript of Mr. Freeman's June 2013 statement by calling one of the interviewing officers, Detective Brett Airy, but the court barred its

4

admission. Trial Tr. 1090 (trial court explaining, "You know what, that could have been used to impeach Mr. Freeman when he was here. I don't know how you can get it in through [the officer].").

### C. Ricky Hammons Testimony

Ricky Hammons was 14 years old in March 1993. At the time, his sister was dating Mr. Freeman. Mr. Hammons testified that on the evening Ms. Rison disappeared, he was in the loft of a barn by his house getting ready to smoke a joint when Mr. Freeman and Mr. Tibbs pulled in driving Hammons's sister's silver Buick. Trial Tr. 132, 135−36. Immediately after pulling into the barn, Mr. Freeman popped the trunk, revealing a dead body. Trial Tr. at 136−37. Mr. Freeman and Mr. Tibbs argued and scurried around the barn for at least 15 minutes, with the trunk open the whole time. Trial Tr. at 139−40, 153. Finally, Mr. Tibbs said, "I know what we can do." Trial Tr. at 140. Then Mr. Tibbs and Mr. Freeman closed the trunk, got in the car, and left. *Id.*

Mr. Hammons testified that he never asked for anything in exchange for his information. Trial Tr. at 145. But before a 2008 interview with law enforcement, he asked to speak "off the record" and then immediately mentioned that he had been approved for transfer to a lower security prison. Trial Tr. at 148−49. The officers warned him that he was being recorded, and Mr. Hammons dropped the subject. Trial Tr. at 149. Mr. Hammons was transferred from Wabash Valley Correctional Facility to Westville Correctional Facility later that month. Trial Tr. at 159.

### D. Other Evidence Implicating Mr. Tibbs

Patricia Garner-Umphrey testified that while Ms. Rison was still missing, Mr. Tibbs confessed to causing Ms. Rison's death. Trial Tr. 164−67. Mr. Tibbs was being chased by a group of peers trying to confront him about Ms. Rison, and he fled to Ms. Garner-Umphrey's house. Trial Tr. 164; *see* Trial Tr. 194−95 (Mark Allen Lilly testifying about Mr. Tibbs fleeing when

5

group of "kids" confronted him about Ms. Rison). Mr. Tibbs told Ms. Garner-Umphrey that there had been an accident and that he had killed Ms. Rison. Trial Tr. 165−67. Ms. Garner-Umphrey reported the confession to police, and they followed up but did not believe her. Trial Tr. 167. She also told Mr. Tibbs that he needed to tell his parents about what had happened. *Id.* On cross-examination, Ms. Garner-Umphrey acknowledged that she was taking medication and had been hospitalized multiple times for unspecified psychiatric issues. Trial Tr. 173. Ms. Garner-Umphrey's son corroborated Mr. Tibbs's conversation with his mother and testified that after the conversation she instructed him to "stay away from" Mr. Tibbs. Trial Tr. 181.

Three unrelated witnesses testified that they saw Ms. Rison in the parking lot of the animal hospital shortly after 6:00 PM on the day she disappeared. Renee Gazarkiencz saw Ms. Rison standing outside a car and talking to two individuals inside the car. Trial Tr. 381−85. Ms. Gazarkiencz believed the car was blue, but she provided descriptions of the headlights and hubcaps that were consistent with the headlights and hubcaps from Mr. Freeman's girlfriend's silver Buick. Trial Tr. 394−401, 410. Pam Rosebaum saw a young woman talking to a young man next to a silver car. Trial Tr. 413−17. And Brian Durham saw a young woman yelling at a young man in the parking lot, while another young man sat in the driver's seat of a vehicle nearby. Trial Tr. 521−36.

The State introduced prior statements from Mr. Tibbs, including statements to police and testimony he had provided to a grand jury. In a statement to police about a month after Ms. Rison's disappearance, Mr. Tibbs told the officer that he was with Chad Green and James Amor on the evening Ms. Rison disappeared, and he reported that they drove by the animal hospital shortly before 6:00 PM. Trial Tr. 661−63. Indeed, Mr. Green once corroborated this alibi in a statement to police. Trial Tr. 594. But at trial and in a pretrial deposition, Mr. Green testified that he made

6

that statement to police only because Mr. Tibbs had asked him to, and he did not actually recall being with Mr. Tibbs on the night Ms. Rison disappeared. Trial Tr. 593−94. Similarly, James Amor once told police that he was with Mr. Tibbs on the afternoon Ms. Rison disappeared. Trial Tr. 634−36. But at trial, Mr. Amor testified that he remembered being with Mr. Tibbs "later in the night" and otherwise could not recall when they were together. Trial Tr. 624−26. Several other witnesses who had corroborated Mr. Tibbs's alibi in statements to police testified at trial that they did not recall seeing him on the night Ms. Rison disappeared. Trial Tr. 721 (Peggy Johnson); Trial Tr. 724−26 (Jamie Swisher); Trial Tr. 732−33 (Misty Jackson).

### E.     Mr. Tibbs's Defense

Mr. Tibbs presented a two-pronged defense. First, he attempted to show that the timeline of events provided by Mr. Freeman was impossible. To this end, they presented the testimony of a private investigator who conducted a time survey to test Mr. Freeman's version of events. Trial Tr. 828−43. They also presented the testimony of a LaPorte police officer who performed a time survey during the investigation of Mr. Tibbs. Trial Tr. 1127−34.

Second, Mr. Tibbs presented evidence of an alternative suspect, Ms. Rison's brother-in-law Ray McCarty. Mr. McCarty was an early suspect at the time of Ms. Rison's disappearance because he had been convicted in 1991 of child molesting with Ms. Rison as the victim. Trial Tr. 869.

A witness saw Mr. McCarty park his vehicle near the animal hospital, look at a house for sale, leave, and then return to a different parking spot a few minutes later. Trial Tr. 974−76. Another witness saw Mr. McCarty and Mrs. McCarty's vehicles parked on the side of a country road around 6:30 p.m., roughly half a mile from where Ms. Rison's car was later discovered. Trial Tr. 988−94.

In the days after Ms. Rison's disappearance, Mr. McCarty repeatedly lied to police about his whereabouts on the night Ms. Rison disappeared. Trial Tr. 864−66, 875. He eventually admitted that he had been near the animal hospital and had spoken with Ms. Rison shortly before 6:00 p.m. on the day she disappeared. Trial Tr. 854−58. He testified that when he left the animal hospital, he went to Mike's Smoke Shop and later picked up a female hitchhiker. Trial Tr. 861, 876. He testified that he lied to police because he did not want to admit to his wife that he had picked up the female hitchhiker. Trial Tr. 876.

Lori McCarty—Ms. Rison's sister and Mr. McCarty's wife—told an officer during the investigation of Ms. Rison's disappearance that she had cleaned out Mr. McCarty's vehicle. Trial Tr. 1031−32.

Defense counsel tried and failed to introduce evidence of an FBI fiber analysis they believed would tend to inculpate Mr. McCarty. Trial Tr. 1107−1111, 1184.

### F.  Conviction, Appeal, and Post-Conviction-Review

The jury convicted Mr. Tibbs of murder, and the trial court sentenced him to a 40-year prison term. Trial Tr. 1349−50, 1403. On direct appeal, he argued that the trial court violated his right to confront witnesses and due process rights by excluding various testimony and evidence. Dkt. 10-3 at 18−30. He also alleged a due process violation based on the State's failure to disclose evidence that Mr. Hammons received consideration for his testimony. *Id.* at 30−38. The Indiana Court of Appeals affirmed. *Tibbs v. State*, 59 N.E.3d 1005 (Ind. Ct. App. 2016). In his petition for transfer to the Indiana Supreme Court, Mr. Tibbs raised mostly state-law arguments. *See generally* dkt. 10-7. The Indiana Supreme Court denied transfer.

Mr. Tibbs then filed a petition for state post-conviction review alleging that trial counsel was ineffective for (1) failing to make an offer of proof when the trial court excluded the transcript

of Mr. Freeman's June 2013 police interview and (2) failing to present evidence of a 1998 FBI examination that linked fibers found in Mr. and Mrs. McCarty's vehicles to fibers recovered from Ms. Rison's hair. Dkt. 20-2 at 12.

At a hearing on the post-conviction petition, trial counsel testified that he wanted to make an offer of proof to introduce the transcript of the June 2013 interview during Detective Airy's testimony, but they got sidetracked by a *Brady* issue with the same witness. *Id.* at 37; *cf.* Trial Tr. 1118−26 (sidebar discussing potential *Brady* violation).

Trial counsel testified at the same hearing that he considered the fiber evidence important and that they repeatedly tried to contact the FBI agent who conducted the analysis. Dkt. 20-4 at 19−20. Between 1998 and 2014, the FBI had repudiated their previous hair and fiber analyses. *See* dkt. 20-4 at 83 (trial counsel testifying about a 2009 National Academy of Science report repudiating fiber analysis, as well as memoranda from the FBI explaining that they were rescinding their conclusions about hair and fiber analyses). When trial counsel could not secure the FBI agent's presence, the two defense attorneys disagreed about whether to request a continuance. *Id.* at 27. Ultimately, they did not request a continuance, and the fiber evidence was not presented. *Id.* The FBI agent who conducted the analysis did not testify at the post-conviction hearing. Petitioner submitted a report, which provides, in relevant part, "Green acrylic fibers were found in the 065 hair mass and in the K6 head hair sample from the victim. These fibers exhibit the same microscopic characteristics and optical properties as green acrylic fibers previously found in the suspect's car (1980 Datsun) and in the suspect's wife's car (Sunbird). These fibers could have originated from the same source." Dkt. 20-5. The post-conviction trial court excluded this report as hearsay, and the report is part of the record only as an offer of proof. Dkt. 20-4 at 41−42. The post-conviction transcripts reference grand jury testimony from Douglas Deedrich, the FBI agent

9

who conducted the fiber analysis, but no transcripts of Deedrich's grand jury testimony were introduced in the state post-conviction proceedings or otherwise made part of the state court record. *See*, *e.g.*, *id.* at 46 (trial counsel testifying about Deedrich's grand jury testimony). Nor has Mr. Tibbs sought to expand the record in his § 2254 proceedings with those grand jury transcripts.

The trial court denied relief on the post-conviction petition. Dkt. 20-2 at 68−72. Mr. Tibbs raised the same claims throughout the post-conviction appellate process. *See generally* dkt. 10-13; dkt. 10-17. The Indiana Court of Appeals affirmed, and the Indiana Supreme Court denied transfer. *Tibbs v. State*, 19A-PC-1085, 2019 WL 3418595 (Ind. Ct. App. July 30, 2019), *available at* dkt. 10-16; dkt. 10-12 at 5.

### G. 28 U.S.C. § 2254 Proceedings

Mr. Tibbs next filed a *pro se* 28 U.S.C. § 2254 petition for writ of habeas corpus. Dkt. 1. Counsel has since appeared and filed a supplemental petition on Mr. Tibbs's behalf. Dkt. 26. The supplemental petition specifies that Mr. Tibbs seeks habeas relief based on his claim that trial counsel was ineffective for failing to

1) introduce evidence that fibers found in Ms. Rison's hair matched fibers from Mr. McCarty's vehicle;

2) make an offer of proof of Mr. Freeman's June 2013 interview transcript when the trial court denied its admission;

3) articulate the reasons for offering the June 2013 transcript during Detective Airy's testimony; and

4) adequately cross examine Mr. Freeman using the June 2013 transcript.

Dkt. 26. In his response, the respondent argues that (a) any contention of inadequate cross-examination is procedurally defaulted and (b) Mr. Tibbs has failed to show ineffective assistance of counsel based on the remainder of his allegations. Dkt. 27. In his reply, Mr. Tibbs argues that

10

the procedural default defense is waived and meritless; he maintains that he is entitled to habeas relief based on trial counsel's ineffectiveness. Dkt. 28.

## II. Habeas Standards

A federal court may grant habeas relief to a person in custody pursuant to the judgment of a state court only if the petitioner shows that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). Where a state court has adjudicated the merits of a petitioner's claim, a federal court cannot grant habeas relief unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Put differently, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

"The decision federal courts look to is the last reasoned state-court decision to decide the merits of the case." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc). If the last reasoned state court decision did not adjudicate the merits of a claim, or if the plaintiff can overcome § 2254(d)'s bar, federal habeas review of that claim is *de novo*. *Thomas v. Clements*, 789 F.3d 760, 766−68 (7th Cir. 2015).

## III. Discussion

### A. Procedural Default

Respondent argues that Mr. Tibbs's due process and confrontation claims are procedurally defaulted because Mr. Tibbs did not present them throughout one complete round of Indiana's ordinary appellate process. Dkt. 10 at 10−16; *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

In his reply, Mr. Tibbs concedes that these claims are defaulted, and he offers no basis to excuse the defaults. Dkt. 19 at 1 ("[T]he only issues that are preserved for review in this Court is whether Mr. Tibbs was denied the effective assistance of counsel when trial counsel failed to present scientific exculpatory evidence and failed to adequately preserve the record for appeal by offering the transcript of Freeman's interview as an offer of proof."). The Court accepts Mr. Tibbs's concession and finds that it cannot provide relief on these procedurally defaulted claims.

The Court need not decide whether Mr. Tibbs also procedurally defaulted part of his ineffective assistance of counsel claim and instead addresses that claim on the merits. *See Estremera v. United States*, 724 F.3d 773, 775 (7th Cir. 2013) ("There is no necessary priority among non-jurisdictional reasons for rejecting a suit or claim. . . . [I]t makes sense (and is permissible) to reject a collateral attack on the merits while other procedural defenses, such as waiver, default, or lack of exhaustion, remain in the background.").

### B.   Ineffective Assistance of Trial Counsel

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed on a claim that counsel was ineffective, a petitioner must show (1) that counsel's performance "fell below an objective standard of reasonableness" and (2) "that the deficient performance prejudiced the defense." *Id.* at 687−88.

#### 1.   Deficient performance

The Indiana Court of Appeals assumed that trial counsel was deficient for failing to introduce evidence of the 1998 FBI fiber examination and for failing to properly use the transcript of Mr. Freeman's June 2013 police interview to impeach Mr. Freeman and an officer who interviewed him.

This Court does the same. Notably, both trial attorneys testified that they wanted to introduce the FBI fiber examination and the transcript of Mr. Freeman's June 2013 interview. Their failures to do so were not strategic decisions but apparent failures to take the proper steps in each instance.

### 2.   Prejudice

The Indiana Court of Appeals assumed two instances of deficient performance, but it did not assess the combined prejudicial impact of counsel's performance. Dkt. 10-16 at 13−14 (assessing impact of each alleged error separately and concluding that Mr. Tibbs was not prejudiced). "In these circumstances, where the state habeas court has not conducted a cumulative prejudice analysis, we must undertake the inquiry on our own in the first instance." *Myers v. Neal*, 975 F.3d 611, 624 (7th Cir. 2020). Accordingly, this Court will assess the *Strickland* prejudice prong *de novo*.

Mr. Tibbs must therefore demonstrate a "reasonable probability" that the outcome of his trial would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 694. It is not enough to show "some" impact. *See Myers*, 975 F.3d at 624 (finding no prejudice even though "counsel's deficient performance undoubtedly had some impact on the trial"). The petitioner's burden to show prejudice depends on how strong the overall evidence of guilt was at trial. *See Cook v. Foster*, 948 F.3d 896, 909 (7th Cir. 2020) ("In deciding whether there is a reasonable probability that the errors changed the outcome of the trial, the court must consider all of the evidence. Logically, a verdict weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Strickland*, 466 U.S. at 696 (same).

Mr. Tibbs has not demonstrated a reasonable probability that counsel's alleged errors, even when taken together, would have changed the outcome of his trial.

The 1998 FBI fiber examination carries very little weight in the prejudice analysis. Mr. Tibbs has not identified any witness who would testify about the fiber analysis. Nor has he provided any evidence about what the substance of such testimony would be. Mr. Tibbs suggests that even if no witness was available, then trial counsel could have introduced transcripts of FBI Agent Deedrich's prior grand jury testimony. Dkt. 19 at 17−18. But that testimony is not part of the record before the Court. And Agent Deedrich's one-page examination report[1] provides merely that fibers found in Ms. Rison's hair "could have originated from the same source" as fibers found in Mr. McCarty's and Mrs. McCarty's vehicles. Dkt. 20-5 at 3. The report offers no explanation of any methodology, so the Court cannot assess whether the results would have been admissible. *See* Ind. R. Evid. 702(b) ("Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles."). And admissibility is doubtful, because it was clear by the time of trial that the FBI was not willing to stand by its prior analysis. *See* dkt. 20-4 at 83−84. Mr. Tibbs has therefore failed to show that a reasonable factfinder would assign any weight whatsoever to the fiber analysis—assuming it was even admissible.[2]

Counsel's alleged misuse of the June 2013 interview transcript is different. Evidence that police fed information to the state's lead witness during an interrogation would, in some cases,

---

[1] The Court assumes that the report is part of the "evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), even though the post-conviction trial court allowed the report to be admitted only as an offer of proof, dkt. 20-4 at 41−42.

[2] Mr. Tibbs gains no traction in his argument that the fiber analysis would have persuaded the trial court of a sufficient "link" between Mr. McCarty and the murder, thereby opening the door for a variety of other evidence pointing to Mr. McCarty as an alternative suspect. *See* dkt. 19 at 7−11. The trial court's evidentiary rulings excluding other evidence of Mr. McCarty's guilt are not before the Court.

14

create a reasonable probability of a different result. But this is not such a case, for at least two reasons.

First, trial counsel substantially impeached Mr. Freeman on cross-examination, showing that he had made multiple prior inconsistent statements and showing that officers had provided some of the information underlying his testimony. Trial Tr. 109−121. As the Indiana Court of Appeals found, "the jury was aware that Freeman was not consistently forthright during his interview . . . Tibbs had, and took some advantage of, the opportunity to cross-examine Freeman regarding his inconsistent statements." *Tibbs*, 59 N.E.3d at 1017. Moreover, trial counsel further undermined Mr. Freeman's testimony by eliciting testimony from two witnesses, including a law enforcement officer who worked the case, to try to show that Mr. Freeman's timeline of events was impossible. Trial Tr. 828−43; Trial Tr. 1127−34. The marginal benefit of additional impeachment under these circumstances likely would have been minimal.

Second, the State's other evidence at trial both corroborated Mr. Freeman's testimony and provided substantial independent evidence against Mr. Tibbs. Multiple eyewitnesses corroborated Mr. Freeman's testimony that he and Mr. Tibbs were with Ms. Rison in the animal hospital parking lot the evening she disappeared. Trial Tr. 381−410 (Renee Gazarkiencz); Trial Tr. 413−17 (Pam Rosebaum); Trial Tr. 521−36 (Brian Durham). Mr. Hammons testified that he saw Mr. Tibbs with Ms. Rison's body in the trunk of a car. 136−37. Ms. Garner-Umphrey testified that Mr. Tibbs confessed to killing Ms. Rison. Trial Tr. 164−67. And no one testified at trial to support the alibi Mr. Tibbs gave to police. Indeed, one witness testified that he initially told police he was with Mr. Tibbs on the evening of Ms. Rison's disappearance—because Mr. Tibbs had asked him to— but then testified at trial that his statement to police was false. Trial Tr. 593−94.

Given the substantial evidence presented at trial there is no reasonable probability that the better use of the June 2013 interview transcript, plus whatever limited value might have been gained from attempting to introduce the 1998 fiber examination, would have changed the result of Mr. Tibbs's trial. He is therefore not entitled to relief on his ineffective assistance of counsel claim, and his petition for writ of habeas corpus is **DENIED**.

## IV.     Certificate of Appealability

"A state prisoner whose petition for a writ of habeas corpus is denied by a federal district court does not enjoy an absolute right to appeal." *Buck v. Davis*, 580 U.S. 100, 115 (2017). Instead, the petitioner must first obtain a certificate of appealability, which will issue only if the petitioner has made "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(1), (c)(2). In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck*, 580 U.S. at 115 (cleaned up). Rule 11(a) of the Rules Governing Section 2254 Proceedings in the United States District Courts requires the district court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

Here, reasonable jurists could disagree about whether habeas relief is warranted on Mr. Tibbs's ineffective assistance of counsel claim. Accordingly, a certificate of **appealability shall issue** on that claim.

## V. Conclusion

The petition for writ of habeas corpus is **DENIED**, but a certificate of appealability **shall issue** on Mr. Tibbs's claim that trial counsel was ineffective. Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 6/1/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Russell W Brown Jr.
SCOTT KING GROUP
rbrown@kbmtriallawyers.com

Caroline Templeton
INDIANA ATTORNEY GENERAL
caroline.templeton@atg.in.gov